1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

CAREPARTNERS, LLC, et al,

10

Plaintiffs,

NO.  C05-1104RSL

11

vs.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

12

PAT LASHWAY, et al,

13

Defendants.

14

    This matter comes before the Court on "Defendants' Memorandum in Support of Motion

15

for Summary Judgment (Rooker Feldman)" (Dkt. #47) and "Defendants' Memorandum in

16

Support of Motion for Summary Judgment (Qualified Immunity)" (Dkt. #40).  Plaintiffs allege

17

that defendants violated their constitutional rights in the course of summarily suspending the

18

license of a boarding home operated by plaintiffs in 2003.  Defendants move for summary

19

judgment and argue that plaintiffs' claims are barred by the Rooker-Feldman doctrine, or

20

alternatively, that they are entitled to qualified immunity.[1]

21

**I.  FACTS**

22

    The following facts are either undisputed or, where a dispute exists, it is resolved in

23

plaintiffs' favor.  The State of Washington has licensed and regulated boarding homes since

24

25

26

    [1] Because this matter can be decided on the memoranda, declarations, and exhibits
submitted by the parties, defendants' request for oral argument is DENIED.

27

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT-1

28

1958.[2]  RCW 18.20.030.  As part of this regulatory responsibility, the State has instituted comprehensive boarding home rules regulating building construction, medical care, safety, and other details related to resident care.  These rules are generally enforced by the Department of Social and Health Services ("DSHS"), but fire protection standards are established by the state Fire Marshal's Office, a subdivision of the Washington State Patrol.  RCW 18.20.110, 18.20.130.  In 2002 and 2003, DSHS and the Fire Marshal's Office began requiring boarding homes with more than two semi or non-ambulatory residents[3] to install fire sprinklers.

Plaintiff Joseph Kilkelly and his company CarePartners Management LLC own and/or manage a number of assisted living facilities in the State of Washington.  This case centers primarily around the investigation by state officials of one of plaintiffs' facilities, Alderwood Assisted Living (the "Alderwood facility"), in 2003.  The immediate dispute began in February, 2003, when deputy fire marshals conducted routine inspections of both the Alderwood facility and another boarding home operated by plaintiffs, Wenatchee Assisted Living (the "Wenatchee facility").   Following these inspections the Wenatchee facility was issued a violation notice for having too many semi and non-ambulatory residents in a boarding home without fire sprinklers.  Declaration of C. Duane Van Beek (Dkt. #44) ("Van Beek Decl."), Ex. A.  An inspection of the Alderwood facility, also in February, raised similar questions about whether it too had residents who were not sufficiently ambulatory to reside in a non-sprinklered facility.  Declaration of Nancy Tyson (Dkt. #42) ("Tyson Decl.), Ex. E.  In response to these inspections, Kilkelly sent a letter to the fire marshal on February 28, 2003 disputing the citation of the Wenatchee facility.

---

[2] Boarding homes provide housing, basic services, and assume general responsibility for the safety and well being of seven or more residents who reside there typically because age or disability has left them unable to fully care for themselves.  RCW 18.20.020(1), (11).  Boarding homes are also commonly referred to as "assisted living" centers.

[3] On a general level, both parties agree that the ambulatory status of the resident refers, in this context, to their ability to exit the building on their own accord in the event of an emergency. The parties disagree about how the term should be applied with regard to specific residents.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT-2

1   Tyson Decl., Ex. D.  In the letter, plaintiff argued that the marshal lacked the necessary expertise

2   to make determinations of ambulatory capability and explained why he believed that both the

3   Alderwood and Wenatchee facilities were in compliance with state regulations.  Kilkelly sent a

4   similar e-mail to a DSHS official on March 1, 2003.  Tyson Decl., Ex. E.

5          On June 23, and 24, 2003, a deputy fire marshal, together with four boarding home

6   licensing staff—most of whom were registered nurses—returned to the Alderwood and

7   Wenatchee facilities to conduct joint inspections to evaluate residents and review health records

8   to more accurately assess residents' ambulatory status.  Based on interviews, observations and a

9   review of records, the inspectors concluded that 46 of the 52 residents of the Alderwood

10  facility,[4] and 12 of the 48 residents of the Wenatchee facility were not fully ambulatory.  In

11  addition, inspectors also concluded that both facilities had flaws in their fire evacuation

12  procedures.  On June 27, 2003, the Alderwood facility had conditions imposed on its license and

13  was ordered to provide a plan of correction within ten days.  The conditions required: (1) all but

14  two semi and non-ambulatory residents to be discharged within thirty days; (2) the remaining

15  two non-ambulatory residents to be housed on the first floor; (3) the facility to contact the local

16  fire department to discuss the level of risk to residents and evacuation plans within 24 hours; (4)

17  the hiring of staff to conduct a 24-hour fire watch with no additional duties within 24 hours; and

18  (5) the training of staff and residents on evacuation plans within seven days.[5]  Tyson Decl., Ex.

19

20  _____

       [4] Medicaid assessments for 31 of the 38 Medicaid residents indicated that they were semi
21  or non-ambulatory and the Alderwood facility's own records identified 37 of the 52 residents
    requiring evacuation assistance.
22

23     [5] The inspection of the Wenatchee facility also resulted in the imposition of conditions on
    the facility's license.  Tyson Decl., Ex. H.  The most significant condition was the requirement
24  that the facility discharge 10 of the 12 semi-ambulatory residents and move the two remaining
    semi-ambulatory residents to the first floor.  Ultimately the Wenatchee facility submitted the
25  required plan of correction and discharged nine semi-ambulatory residents (another passed away).
    Subsequently, a sprinkler system was installed and the facility was again permitted to admit semi
26  and non-ambulatory residents.

27  ORDER GRANTING IN PART AND
    DENYING IN PART DEFENDANTS'
28  MOTIONS FOR SUMMARY JUDGMENT-3

1   J.      After several requests, the Region 3 Regional Administrator and field manager agreed to

2   meet with plaintiffs, plaintiffs' attorney and the administrator of the Alderwood facility on July

3   10, 2003 to discuss what progress had been made on the plan of correction.  On July 11, 2003

4   state boarding home regulators met internally to discuss the situation.  At that meeting,

5   defendant Pat Lashway, the Director of Residential Care Services for DSHS, issued an order

6   immediately suspending plaintiffs' Alderwood license on the ground that the facility's failure to

7   comply with fire safety regulations presented an imminent danger to the residents of the home.

8   Tyson Decl., Ex. K.  The order also permanently revoked the Alderwood license and stopped the

9   placement of new residents.  Defendants contend that the decision to summarily suspend the

10  Alderwood license was made because they were concerned that the Alderwood facility had not

11  taken sufficient action to relocate semi and non-ambulatory residents and had not implemented

12  the required fire watch properly.  Tyson Decl. at p. 10.

13          In response to the order, plaintiffs took their story to the media, filed an immediate

14  administrative appeal of the license suspension, revocation, and the stop placement order, and

15  asked the Thurston County Superior Court for an emergency stay pending the appeal.  The

16  Superior Court granted a temporary ten-day stay and ordered the parties to present briefing and

17  to engage in mediation.  In the mediation, DSHS offered to rescind the licensing suspension and

18  allow semi and non-ambulatory residents to remain at the Alderwood facility if plaintiffs agreed

19  to install sprinklers and hire full-time fire fighters to patrol floors where semi and non-

20  ambulatory residents were housed.  Tyson Decl., Ex. L.  Though Mr. Kilkelly agreed to install

21  sprinklers, he would not agree to hire firefighters pending installation, arguing that the financial

22  cost of such a measure would be fatal to the business.  It was on this issue that negotiations

23  broke down.

24          On July 24, 2003 the Superior Court denied plaintiffs' motion for a stay.  Declaration of

25  Catherine Hoover (Dkt. # 48) ("Hoover Decl."), Ex. E.  Plaintiffs appealed the Superior Court's

26  decision to the Washington State Court of Appeals.  Again, both parties filed briefing on

27  ORDER GRANTING IN PART AND
    DENYING IN PART DEFENDANTS'
28  MOTIONS FOR SUMMARY JUDGMENT-4

1    whether a stay should be issued.  On August 3, 2003, the Court of Appeals also denied

2    plaintiffs' motion for a stay and found: (1) that plaintiffs had failed to show a likelihood of

3    prevailing on their administrative appeal; (2) there was a sufficient hazard to justify the

4    emergency order; and (3) that the need for boarding home code enforcement outweighed any

5    harm to plaintiffs.  Hoover Decl., Ex. I.  Plaintiffs then proceeded with their administrative

6    appeal.  Plaintiffs moved for summary judgment and prevailed in September, 2005 after the

7    administrative law judge concluded that there was no emergency to justify the summary

8    suspension.  That decision was subsequently reversed by the Board of Appeals, and an appeal of

9    the reversal is currently pending before the Thurston County Superior Court.

10        In addition to his involvement in the licensing issues related to the Alderwood and

11    Wenatchee facilities, plaintiff Kilkelly also was involved in other disputes with DSHS in 2002

12    and 2003.  One such dispute involved the request for an administrative hearing to contest a $300

13    fine issued against CarePartners' Meridian Hills Assisted Living facility.  The administrative

14    hearing on that appeal was held on January 27, 2003 and February 11, 2003.  Plaintiff Kilkelly

15    sought review of the initial decision in that matter on April 28, 2003.  During the same period,

16    Kilkelly was also seeking to acquire a boarding home license for an assisted living facility in

17    Lakewood, Washington.  As part of this effort, Kilkelly lobbied a number of DSHS officials and

18    elected officials with the goal of challenging DSHS's interpretation of licensing rules.

19    Declaration of Michael E. Tardif (Dkt. #41) ("Tardif Decl."), Ex. 3 (correspondence related to

20    that lobbying effort).

21                             **II.  DISCUSSION**

22    **A.**    **Summary Judgment Standard**

23        On a motion for summary judgment, the Court must "view the evidence in the light most

24    favorable to the nonmoving party and determine whether there are any genuine issues of material

25    fact."  Holley v. Crank, 386 F.3d 1248, 1255 (9th Cir. 2004).  All reasonable inferences

26    supported by the evidence are to be drawn in favor of the nonmoving party.  See Villiarimo v.

27

28    ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT-5

1   Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  "[I]f a rational trier of fact might

2   resolve the issues in favor of the nonmoving party, summary judgment must be denied."  T.W.

3   Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

4   **B.    Rooker-Feldman**

5          Defendants contend that plaintiffs' claims should be dismissed under the Rooker-

6   Feldman doctrine because the validity of the emergency suspension has already been upheld in

7   state court.  Defendants substantially overstate the reach of Rooker-Feldman.  As plaintiffs

8   properly point out, the Supreme Court made it clear in Exxon Mobil Corp. v. Saudi Basic Indus.

9   Corp., 544 U.S. 280 (2005) that Rooker-Feldman was confined to cases "brought by state-court

10  losers complaining of injuries caused by state-court judgments rendered before the district court

11  proceedings commenced and inviting district court review and rejection of those judgments."  Id.

12  at 284.  Further, the Ninth Circuit has made it clear that, "where the federal plaintiff does not

13  complain of a legal injury caused by a state court judgment, but rather of a legal injury caused

14  by an adverse party, Rooker-Feldman does not bar jurisdiction."  Noel v. Hall, 341 F.3d 1148,

15  1164 (9th Cir. 2003).  Here, plaintiffs' Section 1983 claims do not seek to undue an injury

16  caused by the state court denial of the request for a stay.  Rather, plaintiffs seek relief for actions

17  taken by state officials in the course of suspending the Alderwood facility's license.  The action

18  is therefore not barred by Rooker-Feldman.[6]

19  **C.    Qualified Immunity**

20         Section 1983 of the Civil Rights Act provides a federal cause of action against any person

21  who, acting under color of state law, deprives another of their federal rights.  The statute itself

22  does not create substantive rights, but merely provides "a method for vindicating federal rights

23  elsewhere conferred."  Graham v. Conner, 490 U.S. 386, 393 (1989).  In determining whether a

24  ————————————

25         [6] Defendants raised the issue of res judicata for the first time in their reply memorandum.
    Because plaintiffs were not been given sufficient notice to respond to these arguments in their
26  response brief, the Court will not consider defendants' res judicata arguments in this Order.

27  ORDER GRANTING IN PART AND
    DENYING IN PART DEFENDANTS'
28  MOTIONS FOR SUMMARY JUDGMENT-6

1   defendant is entitled to qualified immunity, the Court must first consider whether "[t]aken in the
2   light most favorable to the party asserting the injury... the facts alleged show the officer's
3   conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If no
4   constitutional right would have been violated if the allegations were established, then no further
5   inquiry is necessary.  If a violation could be made out, the Court must then determine "whether
6   it would be clear to a reasonable officer that his conduct was unlawful in the situation he
7   confronted."[7]  Id. at 202.

8        **1.    Procedural Due Process**

9        Plaintiffs allege that defendants deprived them of their procedural due process rights
10  when the Alderwood facility's license was revoked "without first providing a full and complete
11  hearing on all the issues."  Complaint at ¶4.2.  Defendants do not deny that plaintiffs had a
12  property interest in the license to operate the Alderwood facility.  Nor do defendants deny that
13  plaintiffs were deprived of this property interest as a result of the summary suspension.  Thus
14  neither party disputes that plaintiffs were entitled to due process of law.  What is in dispute is
15  whether plaintiffs were entitled to a "full and complete hearing" prior to the revocation of their
16  license.

17       In general, the Due Process Clause requires that "an individual be given an opportunity
18  for a hearing *before* he is deprived of any significant property right."  Chalkboard, Inc. v.

19

20       [7] In an effort to prevent constitutional law from stagnating, the Supreme Court insists that
    the trial court determine whether defendant's conduct violated a constitutional right before
21  determining whether the constitutional right was clearly established at the time of plaintiff's injury.
    Without such a two-part analysis, individual rights would be frozen in time as each reviewing
22  court simply determined whether or not defendant's conduct had been found unconstitutional in
    the past.  By first evaluating the constitutional claim on its merits, constitutional rights may
23  develop over time even if the defendant in a particular case is immune from suit because the right
    found to have been violated was not clearly established at the time he or she acted.  If similar
24  conduct should occur in the future, the earlier finding that the conduct implicated a constitutional
    right would ensure that the later defendant would be held responsible and would not be entitled to
25  qualified immunity.
26
27  ORDER GRANTING IN PART AND
    DENYING IN PART DEFENDANTS'
28  MOTIONS FOR SUMMARY JUDGMENT-7

Brandt, 902 F.2d 1375, 1380 (9th Cir. 1990) (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971)) (emphasis in original).  The Supreme Court, however, has "rejected the proposition that [due process] *always* requires the State to provide a hearing prior to the initial deprivation of property."  Gilbert v. Homar, 520 U.S. 924, 930 (1997) (quoting Parratt v. Taylor, 451 U.S. 527, 540 (1986)) (emphasis in original).  "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation."  FDIC v. Mallen, 486 U.S. 230, 240 (1988).

To determine whether a pre-deprivation hearing was constitutionally required in this specific situation, the Court must balance three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).  Having considered these factors in the context of plaintiffs' challenge, and viewing the evidence in the light most favorable to plaintiffs, the Court finds that defendants did not violate the procedural due process rights of plaintiffs.

As an initial matter, the Court acknowledges that plaintiffs' interest was substantial.  The summary revocation of plaintiffs' license resulted in the relocation of the overwhelming majority of the Alderwood facility's residents.  This, in turn, had the effect of essentially putting the Alderwood facility out of business.  With that in mind, the existence of a substantial private interest does not end the Court's inquiry.  Though this interest weighs in favor of a pre-deprivation hearing, it is not determinative.

The Supreme Court has made it clear that even where the private interest affected by the official action is substantial, post-deprivation hearings can satisfy due process concerns when an important government interest is coupled with factors minimizing the risk of an erroneous deprivation.  See Mallen, 486 U.S. at 243-44 (FDIC suspension of bank officer upheld despite

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT-8

lack of pre-deprivation hearing); <u>Barry v. Barchi</u>, 443 U.S. 55, 64-66 (1979) (summary suspension of horse trainer's license did not require pre-deprivation hearing despite substantial private interest at stake). The important government interests at stake here, combined with the presence of factors minimizing the risk of erroneous deprivation, lead the Court to conclude that a pre-deprivation hearing was not constitutionally required in this instance.

The government has a strong interest in protecting vulnerable boarding home residents from fire hazards, particularly those who are semi or non-ambulatory. It is for this reason that the State created a mechanism whereby officials could immediately suspend the license of a boarding home operator if DSHS officials concluded that "a deficiency is an imminent threat to a resident's health, safety or welfare." Former WAC 388-78A-030(5) (1998), repealed by St. Reg. 03-16-047 (Sept. 1, 2004). The Court is "not in a position to second-guess that legislative determination." <u>Soranno's Gasco, Inc. v. Morgan</u>, 874 F.2d 1310, 1318 (9th Cir. 1989) (upholding suspension of petroleum bulk permit without pre-deprivation hearing where state made legislative determination that immediate suspensions were "necessitated by the state's interest in enforcing its pollution control law."). Further, the Supreme Court in <u>Barry</u> held that the state's interest in preserving the integrity of the sport of horse racing was sufficiently important to justify a delay between the suspension of a trainer's license and the provision of a hearing. 443 U.S. at 64-66. The governmental interest in protecting vulnerable residents of boarding homes is at least as great.[8]

In evaluating the danger of erroneous deprivation, courts have given great weight to pre-deprivation determinations made by "an independent body" indicating that the deprivation in question was "not arbitrary." <u>Mallen</u>, 486 U.S. at 244. In <u>Mallen</u>, the Court concluded that an

---

[8] Plaintiffs attempt to minimize the government's interest in this case by questioning whether the residents of the Alderwood facility were actually in imminent harm. The Ninth Circuit, however, has made it clear that "the relevant inquiry is not whether a suspension should have been issued in this particular case, but whether the statutory procedure itself is incapable of affording due process." <u>Soranno's Gasco, Inc.</u>, 874 F.2d at 1318.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT-9

1    "ex parte finding of probable cause" in the form of an indictment of the suspended bank officer

2    served to minimize the danger that the suspension was "baseless or unwarranted."  Id. at 240-41.

3    In Gilbert verification that a suspension of an employee following a drug-related arrest was "not

4    unjustified" was provided by the arrest itself.  520 U.S. at 934 ("as with an indictment, the arrest

5    and formal charges imposed upon respondent 'by an independent body demonstrat[e] that the

6    suspension is not arbitrary.'").  In Barry, state officials relied on the statements of the testing

7    official who maintained that he followed prescribed testing procedures and determined that the

8    trainer's horse was indeed drugged.  Though this evidence was "untested and not beyond error,"

9    the Court concluded that it was "sufficiently reliable to satisfy constitutional requirements."  443

10   U.S. at 65.  The Court went on to note that a post-deprivation hearing was the proper venue to

11   "resolve questions of credibility and conflicts in the evidence."  Id.

12        In this instance, the risk of erroneous deprivation is even less.  Immediately after

13   receiving notice of the summary revocation, plaintiffs applied for and received a temporary stay

14   from the Superior Court.  This stay remained in place while both parties fully briefed the

15   question of whether plaintiffs should be granted a permanent stay pending plaintiffs'

16   administrative appeal.  During that time, all residents were permitted to remain at the Alderwood

17   facility.  Ultimately the Superior Court denied the request for a stay and concluded (1) that

18   plaintiffs had not demonstrated that they were likely to succeed on appeal, and (2) that the threat

19   to public health, safety, or welfare was sufficiently serious to justify the agency action.  Though

20   the temporary stay was at that point lifted, plaintiffs immediately filed a new request for a

21   permanent stay with the Court of Appeals.  The Court of Appeals agreed with the Superior Court

22   and found that the "fire hazard identified by the State Fire Marshal is a sufficient threat to the

23   residents' welfare to justify the Department's actions."  Hoover Decl. Ex. I.  Unlike the

24   individuals in the above cited cases, plaintiffs here had the opportunity to present at least a pared

25   down challenge to the summary revocation to a court prior to the deprivation.  At the very least

26   these proceedings served the purpose of establishing that the summary revocation was "not

27   ORDER GRANTING IN PART AND
     DENYING IN PART DEFENDANTS'
28   MOTIONS FOR SUMMARY JUDGMENT-10

1    arbitrary." <u>Mallen</u>, 486 U.S. at 240.  At best, these proceedings reinforce DSHS's conclusions

2    regarding the danger faced by the residents of the Alderwood facility.  In such instances, the

3    State need not delay an action to protect the safety of vulnerable citizens pending an adversarial

4    hearing to resolve questions of factual disagreement between the parties.  While such a hearing

5    must be held "at a meaningful time and in a meaningful manner," a prompt post-deprivation

6    hearing can provide constitutionally sufficient process.[9]  <u>Barry</u>, 443 U.S. at 66 (quoting

7    <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 (1965)).

8        Plaintiffs contend that this case presents issues similar to those in <u>Chalkboard, Inc. v.</u>

9    <u>Brandt</u>, 902 F.2d 1375 (9th Cir. 1990).  In <u>Chalkboard</u>, the Ninth Circuit held that state officials

10   were not entitled to qualified immunity when they summarily suspended a day care center's

11   license without a pre-deprivation hearing in violation of plaintiff's procedural due process rights.

12   That case, however, is quite different from the one presented here.  Most importantly, the court

13   there concluded that the "risk of error" was "considerable" because the case involved allegations

14   of sexual abuse which required "delicate judgments depending on credibility of witnesses and

15   assessment of conditions not subject to measurement."  <u>Id.</u> at 1381.  The court was careful to

16   distinguish other cases where pre-deprivation hearings were not essential because "the factual

17   issue to be determined" was susceptible to "reasonably precise measurement by external

18   standards."  <u>Id.</u>  Here, the key factual determinations involved the ambulatory status of the

19   residents, whether the facility had adequate fire sprinklers and the immediacy of the danger

20   faced by semi and non-ambulatory residents living in a facility lacking fire sprinklers.  Though

21   the conclusions officials reached on these questions are not infallible, they are susceptible to

22   reasonably precise measurement by trained professionals and are not dependent on the

23   credibility determinations that were at issue in <u>Chalkboard</u>.

24   _____

25       [9] Plaintiffs do not contend that the post-deprivation administrative or legal proceedings
     they utilized after the revocation of the license were constitutionally flawed, and therefore the
26   Court does not address the adequacy of such procedures here.

27   ORDER GRANTING IN PART AND
     DENYING IN PART DEFENDANTS'
28   MOTIONS FOR SUMMARY JUDGMENT-11

1    Chalkboard is also unique in that state officials there made the decision to summarily

2    revoke plaintiff's day care license by means other than those provided by state law.  Under

3    Arizona law, state officials were required to give notice to plaintiffs and seek a restraining order

4    and injunction from a court prior to taking action to address conditions that presented harm to

5    children.  Id. at 1392.  The defendants in Chalkboard disregarded those requirements and

6    summarily suspended plaintiff's license without providing any notice or opportunity for

7    plaintiffs to be heard.  Id.  Here, state officials summarily revoked plaintiffs' license using

8    powers granted to them by the legislature.  The court in Chalkboard acknowledged that in such

9    situations, the courts were "constrained to yield to legislative judgments regarding the threat to

10   the public interest and the need for summary action."  Id.  Plaintiffs' procedural due process

11   claim therefore fails as a matter of law, and as a result the Court need not reach the question of

12   whether it would be clear to defendants that their conduct was unlawful.[10]

13       **2.      Retaliation**

14       Plaintiffs also argue that actions taken by defendants throughout the investigation and

15   suspension process were substantially motivated by a desire to retaliate against plaintiff Kilkelly

16   for his exercise of constitutionally protected rights of speech and to petition government.  Such

17   actions, they contend, violate their First Amendment rights.  Defendants contend that they are

18   entitled to qualified immunity because "there is no clearly established law stating that First

19   Amendment retaliation claims are viable in the context of speech and 'petitions to government'

20   made by regulated businesses as part of administrative proceedings."  Defendants' Motion on

21   Qualified Immunity at p. 18.  Again, as a threshold matter, the Court must first determine

22   whether the facts, if read in the light most favorable to plaintiffs, establish that a constitutional

23

24       ───────────────

25       [10] Plaintiffs also make a number of arguments related to inadequate notice.  While it is true
     that plaintiffs were entitled to notice sufficient to enable them to prepare for a hearing in a
26   meaningful way, plaintiffs have put forward no evidence to suggest that they were given
     insufficient notice to prepare for their post-deprivation administrative and court challenges.

27   ORDER GRANTING IN PART AND
     DENYING IN PART DEFENDANTS'
28   MOTIONS FOR SUMMARY JUDGMENT-12

1  right has been violated.

2     The Court begins by noting that defendants' characterization of the constitutional

3  violation at issue here is fundamentally flawed.  In framing their qualified immunity argument,

4  defendants present the question at issue here as "whether legal arguments made during

5  administrative appeals are protected speech that can support claims for retaliation when the

6  regulatory authority takes future action against a business."  Motion on Qualified Immunity at p.

7  18.  They answer this question in the negative and in doing so rely heavily on Board of County

8  Commissioners of Wabaunsee County v. Umbehr, 518 U.S. 668 (1996) for the proposition that

9  the law with regard to retaliation claims made by regulated businesses is not clearly established

10  and that even if it was, the speech in question would not be protected because it does not relate

11  to issues of public concern.

12     The primary flaw in defendants' analysis is that they incorrectly attempt to export First

13  Amendment standards specific to the public employee context to the situation presented here

14  where non-employees allege that the government has retaliated against them as citizens for their

15  speech.  As the Third Circuit recently explained in another case involving a First Amendment

16  retaliation claim made by a regulated business:

> 17 [t]he 'public concern' test was formulated by the Supreme Court in
> addressing speech restrictions placed by governmental entities on their own
> 18 public employees.  Regulation of public employee speech presented two
> features not present in other forms of speech control.  First, acting as an
> 19 employer, the government has some authority to impose conditions upon
> those who seek jobs, including conditions that limit the exercise of
> 20 otherwise available constitutional rights... Second, 'when someone who is
> paid a salary so that she will contribute to an agency's effective operation
> 21 begins to do or say things that detract from the agency's effective operation,
> the government employer must have some power to restrain her.'

22
23  Eichenlaub v. Township of Indiana, 385 F.3d 274, 282-83 (3rd Cir. 2004) (citation omitted)

24  (quoting Waters v. Churchill, 511 U.S. 661, 675 (1994).  Plaintiffs are not government

25  employees, nor does plaintiffs' relationship to the government trigger the sort of interests that

26  compelled the Supreme Court to draw a distinction between speech of private and public

27  ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
28  MOTIONS FOR SUMMARY JUDGMENT-13

1   concern.  As such, the question of whether plaintiffs' speech is of "public concern" is irrelevant

2   to the retaliation claim at issue in this case.

3          In fact, the Ninth Circuit has made clear what standard is to be used in evaluating

4   retaliation claims made by non-governmental employees in this context.  See Sorrano's Gasco,

5   Inc. v. Morgan, 874 F.2d 1310, 1314-16 (9th Cir. 1989).  In Sorrano's Gasco plaintiffs alleged

6   that the local air pollution control district's decision to revoke its petroleum bulk use permit was

7   motivated by a desire to retaliate against plaintiff Sorrano for his public criticism of, and filing

8   of a lawsuit against, the defendants.  The court found that Sorrano had a "protected interest in

9   commenting on the actions of government officials" and "a right to petition the government for

10  redress of grievances."  Id. at 1314.  The court also held that if plaintiffs could establish that the

11  decision to suspend its permit was made because of Sorrano's exercise of these constitutionally

12  protected rights, a First Amendment violation would be established and plaintiffs would be

13  entitled to relief under Section 1983.  Id.  Once it was established that the speech in question

14  was protected, the court looked to determine whether plaintiffs had made an initial showing that

15  the protected conduct was a "substantial" or "motivating" factor in the defendants' decision.  Id.

16  Having concluded that a prima facie showing had been made, the court stated that "the burden

17  shifts to the defendant to establish that it *would* have reached the same decision even in the

18  absence of the protected conduct."  Id. (emphasis added).  It is not enough to survive summary

19  judgment for defendants to merely show that they *could* have made the same decision absent any

20  retaliatory intent.  Id. at 1316.

21         Plaintiffs identify five specific acts of protected speech that they believe led to the

22  retaliation in question: (1) Kilkelly's pursuit of an administrative appeal of the fine levied

23  against Meridian Hills Assisted Living; (2) Kilkelly's legislative lobbying efforts to acquire a

24  license for the boarding home facility in Lakewood, Washington; (3) Kilkelly's advocacy related

25  to his interpretation of the building codes which would have permitted the Alderwood facility to

26  be grandfathered out of the sprinkler installation requirements; (4) Kilkelly's statement to the

27
    ORDER GRANTING IN PART AND
    DENYING IN PART DEFENDANTS'
28  MOTIONS FOR SUMMARY JUDGMENT-14

press after the license revocation on July 11, 2003; and (5) Kilkelly's pursuit of both administrative review and a court ordered stay of the summary revocation of his license.[11]  The Court agrees with plaintiff that these actions and statements are protected by the First Amendment.

The next question is whether plaintiffs have put forward a prima facie showing that the decision to (1) target them for investigation; (2) summarily suspend and revoke the Alderwood facility's license; and (3) impose certain conditions during settlement negotiations was substantially motivated by a desire to retaliate against them for engaging in protected activities.[12] In support of this allegation, plaintiffs point to a number of pieces of evidence.  First, they maintain that the timing of the investigation and summary suspension is suspicious because both actions came on the heels of the administrative hearing regarding the Meridian Hills facility and Kilkelly's political lobbying to obtain a license for the Lakewood facility.  Plaintiffs also allege that during the course of negotiations state officials indicated that Kilkelly was "known" to the department and that Pat Lashway was "quickly losing patience with Joe."  Declaration of Robin

---

[11] Defendants argue that the complaint only alleges a retaliation claim for speech related to the Meridian Hills administrative appeal and that all other retaliation claims should be disregarded because they are raised for the first time in response to a summary judgment motion.  A quick reading of the complaint and plaintiffs' contention interrogatory responses indicates defendants are mistaken.  In the complaint, plaintiffs allege that the retaliation was in response to Kilkelly "accessing the administrative appeals process in dealing with prior corrective action taken against another facility and his efforts to access the courts to challenge the administrative actions taken against the Alderwood facility in July/July 2003."  Complaint ¶ 4.1.  Further, plaintiffs provided an extensive explanation of their retaliation claims in their response to contention interrogatory number five, including discussion of Kilkelly's speech related to the Lakewood facility and his advocacy related to his understanding of the grandfathering issue.  See Tardif Decl.  Defendants had sufficient notice of the basis for plaintiffs' retaliation claim.

[12] Defendants repeatedly argue that any speech made on or after July 11, 2003 cannot form the basis of a retaliation claim, because the suspension of plaintiffs' license could not have been in retaliation for speech made after the suspension was ordered.  Plaintiffs' retaliation claims, however, are not limited to simply the license suspension, but also include what plaintiffs characterize as retaliatory behavior during settlement negotiations.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT-15

1    Dale (Dkt. #51) ("Dale Decl.") at p. 3.  Further, plaintiffs have put forward some evidence

2    indicating that other boarding home facilities inspected during the same time period were given

3    more favorable treatment that allowed them to stay in business.

4            In the employment context, courts have held that circumstantial evidence created a

5    genuine issue of material fact on the question of retaliatory motive when a plaintiff produces

6    evidence of "proximity in time between the protected action and the allegedly retaliatory"

7    action.  Keyser v. Sacramento City Unified Sch. Dist., 265 F.3d 741, 744 (9th Cir. 2001).  The

8    court in Keyser also held that a genuine issue of material fact could be created when evidence is

9    submitted that the defendant "expressed opposition" to the speech in question.  Id.  Finally, a

10   genuine issue of material fact has also been found when evidence has been produced indicating

11   that the proffered explanation for the act in question was "false and pretextual."  Id.

12           Though plaintiffs' evidence at this point is not substantial and may not be sufficient on its

13   own to proceed to trial, for the purposes of evaluating defendants' qualified immunity defense,

14   the Court concludes that plaintiffs could potentially make out a prima facie case of

15   unconstitutional retaliation if given the opportunity to conduct full discovery.  Once the

16   discovery process is complete, however, the Court will again entertain motions for summary

17   judgment.  At that point defendants can also attempt to establish that they would have reached

18   the same decision regardless of any potential retaliatory motive.  See Sorrano's Gasco, Inc. v.

19   Morgan, 874 F.2d at 1316.

20           Having determined that, if all disputed facts are taken in the light most favorable to

21   plaintiffs, plaintiffs could establish that defendants violated their First Amendment rights, the

22   Court must determine whether the right allegedly violated was clearly established at the time

23   defendants acted.   Saucier v. Katz, 533 U.S. at 202.  Because it was clearly unlawful in 2003 to

24   deliberately retaliate against a citizen's exercise of his right to comment on the actions of

25   government officials or exercise his right to access the courts and the administrative appeals

26   process, defendants are not entitled to qualified immunity on this claim.  See Sorrano's Gasco,

27

1    Inc. v. Morgan, 874 F.2d at 1314-16.

2         **3.    Substantive Due Process**

3         Plaintiffs also allege that "[d]efendants [sic] actions were an intentional abuse of power

4    violative of the substantive components of the due process clause of the Fourteenth

5    Amendment."  Complaint ¶ 4.4.  As plaintiffs themselves acknowledge, however, the Supreme

6    Court has held that substantive due process cannot supply the basis for a Section 1983 claim if

7    the challenged governmental conduct is prohibited by another, more specific, constitutional

8    right.  Graham v. Connor, 490 U.S. 386, 394-95 (1989); see also Armendariz v. Penman, 75

9    F.3d 1311, 1318 (9th Cir. 1996) ("Even if the City's alleged conduct was 'clearly arbitrary and

10   unreasonable, having no substantial relation to the public health, safety, morals, or general

11   welfare,'... the plaintiffs' substantive due process claim fails because it is preempted by other

12   constitutional claims.").  Here, the conduct challenged is more than adequately addressed by

13   plaintiffs' procedural due process and first amendment claims.  As a result, plaintiffs'

14   substantive due process claim fails as a matter of law.

15        **4.    Constitutional Allegations Not Included In Complaint**

16        Plaintiffs have also raised a vagueness claim and an equal protection claim for the first

17   time in response to defendants' summary judgment motion.  These claims are not included in

18   either the complaint or plaintiffs' contention interrogatory responses.  This is troubling given

19   that Judge Robart granted defendants' motion for a more definite statement over a year ago to

20   avoid this very problem.  See Dkt. #9 ("trial courts must resolve immunity questions at the

21   earliest possible stage of litigation in order to protect defendants from potentially unnecessary

22   and burdensome discovery proceedings.").  In that Order, defendants were granted permission to

23   propound contention interrogatories that would enable them to determine the precise scope of

24   the constitutional rights at issue so that qualified immunity issues could be resolved promptly.

25   When asked in those contention interrogatories what specific constitutional violations were

26   being alleged, plaintiffs answered as follows:

27   ORDER GRANTING IN PART AND
     DENYING IN PART DEFENDANTS'
28   MOTIONS FOR SUMMARY JUDGMENT-17

> With respect to each plaintiff, please note that the federally protected rights are all rights referenced within plaintiff's compliant, inclusive of plaintiff's Fourteenth Amendment right to procedural due process prior to the deprivation of his property interest in the license to operate Alderwood Assisted Living; the First Amendment rights to freedom of speech and petition; and rights relative to substantive due process, which generally speaking and discussed below, is predicated on the notion that the government cannot engage in arbitrary capricious and intentionally abusive conduct.

Tardif Decl. at p. 7.  Plaintiffs submitted these responses on February 3, 2006.  They have made no effort since either to amend their complaint or to amend their previous interrogatory responses as they are obligated to do under Federal Rule of Civil Procedure Rule 26(e)(2).  As such, plaintiffs are limited to those claims made in their complaint..

### III.  CONCLUSION

For all the foregoing reasons, defendants' motion for summary judgment on <u>Rooker-Feldman</u> (Dkt. #47) is DENIED.  Defendants' motion for summary judgment on qualified immunity (Dkt. #40) is GRANTED in part and DENIED in part.

Dated this 26th day of January, 2007

Robert S. Lasnik
United States District Judge