1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                              )
CAREPARTNERS, LLC, *et al.*,                    )
                                                              )          No. C05-1104RSL
                              Plaintiffs,          )
                                                              )          ORDER GRANTING DEFENDANTS'
            v.                                            )          MOTION FOR SUMMARY
                                                              )          JUDGMENT AND ORDER TO SHOW
PAT LASHWAY, *et al.*,                             )          CAUSE
                                                              )
                              Defendants.        )
_____)

## I. INTRODUCTION

This matter comes before the Court on defendants' motion for summary judgment (Dkt.

# 172).  Plaintiffs operate residential boarding homes in the State of Washington.  On July 11,

2003, defendant Pat Lashway, the Director of the Residential Care Services Division ("RCS") of

the Department of Social and Health Services ("DSHS"), summarily suspended CarePartners'

license to operate its facility in Lynnwood, Washington.  Plaintiffs allege that defendants, all of

whom are employees of RCS or the State Fire Marshal's Office, initiated enforcement actions

against them in retaliation for plaintiff Joseph Kilkelly's protected speech and petition activities.

Defendants seek summary judgment dismissing plaintiffs' First Amendment retaliation claim.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The following facts are either undisputed or, where a dispute exists, the evidence is viewed in the light most favorable to plaintiff.

### A.  Regulatory Background

The State of Washington has licensed and regulated boarding homes since 1958.  As part of its regulatory responsibility, the state has established comprehensive boarding home rules regulating building construction, medical care, safety, and other details of resident housing and care.  Though these rules are generally enforced by RCS, fire protection standards are established by the Washington State Fire Marshal's Office ("SFM").  The regulations are enforced through unannounced inspections and investigations undertaken in response to complaints.  RCW 18.20.110.  The ten individual defendants named in the complaint were, at all relevant times, employees of SFM or RCS.  Each is sued in his or her personal capacity.

In 1995, the state building code council adopted a licensed care facility code ("LC Code") that requires, *inter alia*, that boarding homes have automatic fire sprinklers if they are (1) licensed for more than sixteen residents or (2) house more than two semi-ambulatory or non-ambulatory residents.  WAC 51-40-0313.8.2.1 (1998).  As of 1999, licensed boarding homes could not accept or retain semi- or non-ambulatory residents unless "the boarding home [were] approved by the Washington state director of fire protection to care for semi-ambulatory or non-ambulatory residents."  WAC 388-78A-240(3)(a) (2002).  In response to a 1998 fire which killed eight boarding home residents, the Washington Legislature also enacted a program to subsidize the cost of retrofitting older facilities with fire sprinklers.  Many facilities took advantage of the retrofitting program before it expired in 2002.  As of July 2003, SFM records showed that only 40 of approximately 500 boarding homes had not installed fire sprinklers and that all but 17 of those 40 were smaller homes with 16 or fewer residents.  Actual enforcement of the LC Code sprinkler requirements was somewhat lax until after the retrofitting program expired in 2002.

Plaintiffs Joseph Kilkelly, Laura Kilkelly, and their company CarePartners Management LLC own and/or manage a number of assisted living facilities in the State of Washington.  In 1999, CarePartners operated several boarding homes including Alderwood Assisted Living ("AAL") in Lynnwood, Washington, and Wenatchee Assisted Living ("WAL") in Wenatchee, Washington.  Though located in different parts of the state – and therefore inspected by different divisions of SFM and RCS –  AAL and WAL were both built from the same plans in 1985 and had similar physical properties and safety features.

**B.  Fire Sprinkler Issues at AAL and WAL**

In December 2001, defendant Pat Lashway, Director of RCS, sent letters to all boarding home operators, including CarePartners, indicating that certain conditions would henceforth apply to facilities that serve semi-and non-ambulatory residents.  The letter provides:

> The State Fire Marshal is responsible for determining the fire safety features of your boarding home according to the applicable fire code.  In the near future, you will receive a letter from the State Fire Marshal that will identify the fire code applicable to your home, and the conditions under which your home may serve semi-ambulatory or non-ambulatory residents.
>
> During licensing inspections, Residential Care Services (RCS) licensing staff will determine the ambulatory status of sampled residents or other residents who come to the attention of licensors, and determine if your boarding home is serving semi- or non-ambulatory residents consistent with the State Fire Marshal's determination.

Plaintiffs' Appendix ("PA") 712.[1]  As promised, on January 9, 2002, defendant Roger Woodside, Assistant State Fire Marshal, sent a letter to AAL indicating that the facility falls under the LC Code.  After citing certain requirements of the code, the letter somewhat ambiguously summarizes the impact of the regulations as follows:

> Your boarding home may serve semi-ambulatory and non-ambulatory residents

---

[1]  Plaintiffs submitted six binders of documents with their opposition memorandum, all of which have been sequentially numbered.  Citations to these documents will be in the form "PA ___."

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -3-

above the ground level only if:

    1.  Your boarding home is divided into at least two compartments by smoke barriers regardless of the number of residents, and

    2.  Your boarding home is fully alarmed if you have 17 or more residents, and

    3.  Fire sprinklers are required if:

        a.  Your building is three or more stories, or
        b.  You are licensed to serve more than 16 residents, or
        c.  You serve a total of three or more semi-ambulatory and non-ambulatory residents.

PA 715-16.  Though not apparent from the face of the letter, Woodside's letter is based on two independent sections of the LC Code.  The first section, WAC 51-40-313.4.4, sets forth emergency escape requirements for semi- and non-ambulatory residents above the ground floor.  The second section, WAC 51-40-313.8.2, establishes sprinkler requirements for facilities that house more than 16 residents or that house more than 2 semi- and non-ambulatory residents.  The fire sprinkler requirement in the LC Code is not dependent on whether semi- or non-ambulatory residents are housed above the ground floor.  However, because the letter lists the sprinkler requirements after the phrase "Your boarding home may serve semi-ambulatory and non-ambulatory residents above the ground level only if," the recipient could reasonably, but erroneously, conclude that the two considerations were linked.

    After reviewing these letters, CarePartners determined that it was not required to install sprinklers as long as only two semi- or non-ambulatory residents were housed on the second floor.  Deputy Fire Marshal Bob Berney (not a defendant in this case) allegedly confirmed CarePartners' erroneous understanding to AAL staff during his inspection on May 3, 2002.[2]

---

[2] There is no admissible evidence regarding what Berney said during his May 3, 2002, inspection.  The account presented in the text comes from plaintiff Joseph Kilkelly's Declaration, dated October 10, 2006.  PA 553.  Kilkelly does not, however,  provide any facts from which one could infer personal knowledge.  There is no indication that Kilkelly was present during the inspection or otherwise

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE       -4-

### C.  Meridian Hills Dispute

In mid-2002, CarePartners' Meridian Hills facility in Puyallup, Washington, received a Statement of Deficiencies and an associated $300 fine during its annual RCS inspection.  Kilkelly and CarePartners requested informal dispute resolution and ultimately filed an administrative appeal challenging the results of the survey.  Administrative hearings took place in January and February 2003.  On October 20, 2003, the Board of Appeals upheld two of the three alleged regulatory violations and levied a $200 fine against the facility.  Kilkelly did not think the administrative hearing was "particularly heated."  PA 544.

### D.  "Grandfathering" the Lakewood Facility

In early 2003, Kilkelly became interested in leasing a boarding home in Lakewood, Washington.  Unfortunately, the owners had allowed their boarding home license to lapse a few months earlier.  In order to obtain a new license, CarePartners would have to update the facility to meet current building codes.  Kilkelly contacted RCS, including defendant Nancy Tyson, to see whether CarePartners' application could be treated as related to an existing facility and therefore "grandfathered" under the old building codes.  When RCS determined that, in the absence of a current license, CarePartners' application would be considered an initial application, Kilkelly wrote to legislators and RCS' Director, defendant Lashway, in the hopes of obtaining a more favorable interpretation of the licensing rules.  PA 699.  On February 14, 2003, Lashway rejected Kilkelly's request that the Lakewood application be treated as if the facility were a currently-licensed boarding home.  PA 700-01.

### E.  Interactions with SFM

On February 3, 2003, Deputy Fire Marshal Duane Van Beek (not a defendant in this case) inspected WAL and issued a Statement of Violations & Corrective Action.  SFM identified

---

conferred directly with Berney.  Giving plaintiffs every benefit of the doubt, the Court will nevertheless assume that Berney confirmed plaintiffs' erroneous understanding of the LC Code requirements.

fifteen residents as semi-ambulatory and required plaintiffs to "provide a[n] automatic fire sprinkler system or limit the semi-ambulatory residents to a maximum of 2 and limited to ground floor occupancy." PA 719. On February 28, 2003, Kilkelly responded to Van Beek by letter, disputing SFM's authority to assess the ambulatory status of WAL's residents and pointing out that CarePartners also operates a physically "identical" facility in Lynnwood which had not been similarly cited. PA 728-30. Kilkelly, relying in part on defendant Woodside's January 9, 2002, letter, argued that fire sprinklers were not required because WAL is a two-story facility that houses less than three semi- or non-ambulatory residents on the second floor. Id. Kilkelly also sent an e-mail to the Eastern Washington RCS Regional Manager, Tim Vox (not a defendant in this case), regarding this issue. PA 723.

On March 3, 2003, defendant Deputy Fire Marshal Ed Borgatti initiated a conversation within SFM regarding the need for sprinklers and a home's ability to house semi-and non-ambulatory residents on the second floor. PA 733. Borgatti sent an e-mail titled "Alderwood/Wenatchee Assisted Living" to various deputy fire marshals around the state noting that a difference of opinion had arisen concerning how to handle what appeared to be like facilities, AAL and WAL. Id. The ensuing exchange among SFM officials demonstrates confusion among SFM staff and an effort to develop a consensus approach. Borgatti initially believed that AAL was in compliance even though it did not have sprinklers because it was built before the adoption of the LC Code. Id. Defendant Deputy Fire Marshal Michael Sturgeon and Van Beek disagreed, however, arguing that Section 313.8.2.1 clearly requires that facilities like AAL and WAL have fire sprinklers. PA 733, 734, and 740. Ultimately, Sturgeon and Van Beek's position prevailed. Notably absent from these exchanges is any mention of Kilkelly, the Meridian Hills and/or Lakewood facility disputes, Kilkelly's lobbying efforts, or any animus, retaliatory or otherwise, towards the Kilkellys or CarePartners.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -6-

**F.  Interactions with RCS**

Meanwhile, RCS conducted its annual inspection of AAL on February 27, 2003. Defendant Katherine Webb questioned whether AAL's residents were sufficiently ambulatory to reside in a non-sprinklered facility.  PA 558.  In response, Kilkelly contacted defendant Julie Lord, the RCS regional administrator, and offered to provide a report on the ambulatory capabilities of AAL's second-floor residents.  PA 785.  When RCS requested copies of resident records so the agency could better determine their ambulatory status, Kilkelly refused on the ground that "the dismantling of a number of resident files [was] simply too onerous[] and disruptive to the daily care of our residents."  PA 558-59.  Kilkelly instead invited RCS to inspect the records onsite.  Kilkelly also left voicemail messages with the local RCS office indicating that he believed AAL was in compliance with the LC Code.  A subsequent e-mail between defendants Webb and Lord shows that they disagreed with Kilkelly's interpretation of the sprinkler regulation and were under the impression that the AAL facility probably met two out of the three criteria for sprinklers, depending on the number of semi- and non-ambulatory residents at AAL. PA 786.

On March 31, 2003, and April 1, 2003, RCS inspected WAL.  The three-person team found violations of WAC 388-78A-240 based on their observations of at least eight residents who would be incapable of evacuating the facility in case of an emergency.  PA 753-57.  CarePartners responded by promising to relocate some of the less mobile residents to the first floor and by initiating the informal dispute process.  PA 761, 763-5, and 770.  In May 2003, Kilkelly again contacted RCS Regional Manager Tim Vox regarding the correct interpretation of "ambulation." PA 777.

**G.  Coordination Between RCS and SFM**

The inspections at WAL and AAL brought the sprinkler and ambulatory status questions to the attention of higher level officials at RCS and SFM, including defendant Joyce Stockwell,

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -7-

Deputy Director at RCS. A conference call was organized on June 5, 2003, in which defendants Tyson, Stockwell, Borgatti, Sturgeon, Lord, and seven non-defendants reviewed the existing regulatory scheme, discussed facility and population data at WAL and AAL, and developed a plan of action. The participants generally agreed that (1) sprinklers were required if a facility housed more than two semi- or non-ambulatory residents, (2) the plans of corrective action proposed to date by CarePartners were not acceptable, and (3) additional information was needed before a recommendation regarding license conditions or revocation could be made. PA 1599 and 1982-83. It was determined that the agencies would conduct joint inspections of AAL and WAL: RCS would assess the residents' ambulatory status and SFM would inspect for fire code violations.

On June 23 and 24, 2003, defendants Sturgeon and Webb, along with other RCS boarding home licensing staff, returned to AAL to conduct the joint inspection. At the same time, Van Beek and RCS staff performed similar inspections at WAL. Based on interviews, observations, and a review of records, the inspectors concluded that 46 of the 52 residents at AAL and 12 of the 48 residents at WAL were not fully ambulatory. The inspectors also concluded that both facilities had serious flaws in their fire evacuation procedures, including a "defend in place" fire policy requiring residents to remain in their rooms during a fire. PA 794-801 (AAL Statement of Deficiencies).

## F.    RCS Actions on AAL's License

On June 27, 2003, RCS faxed a copy of the Statement of Deficiencies to AAL, ordered the facility to provide plans of correction within ten days, and imposed conditions on AAL's license. PA 791-801. AAL's license was conditioned on (1) the discharge of all but two semi- and non-ambulatory residents within thirty days, (2) the housing of all semi- and non-ambulatory residents on the first floor of the facility, (3) the immediate development of an evacuation plan in consult with the local fire department, (4) the immediate hiring of additional staff to conduct a

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -8-

24-hour fire watch, and (5) the training of staff and residents on evacuation plans within seven days. PA 792.[3] Similar conditions were placed on WAL's license. According to defendant Tyson, RCS was more concerned with the conditions at AAL due to its very high proportion of not fully ambulatory residents (over 85%).

WAL substantially complied with its conditions by discharging ten semi- and non-ambulatory residents and eventually installing sprinklers. Although CarePartners made efforts to start a fire watch and to confer with the local fire department, it disagreed with RCS's capability assessments and believed that some of the conditions were impossible to satisfy. PA 563-64. By Monday, June 30, 2003, Kilkelly had retained an attorney and was attempting to arrange a meeting with "the heirarchy" at RCS. PA 565. Defendant Lashway declined a meeting after she was informed that all communications from CarePartners' counsel indicated that it was interested only in lessening the conditions placed on its license. Dkt. # 173 at 4. One of CarePartners' attorneys, Robin Dale, spoke with Assistant Attorney General Donna Cobb. Dale avers that Cobb gave him the impression that "Mr. Kilkelly was not one of the department's favorite people" and, further, that Kilkelly "was 'known' to the department," and not in a good way. PA 149. A few days later, Dale declares he had a conversation with another RCS representative, Catherine Hoover, who reportedly told him that Lashway was "quickly losing patience with Joe." Id. Hoover explains in her declaration that the term "patience" was her own, that she was aware of no retaliatory animus, and that she was trying to convey to Dale that the director had no interest in attending a meeting if CarePartners' purpose was only to avoid the conditions on its license. Dkt. # 158 at 3-4.

---

[3] The Fire Marshal's Office generated its own Statement of Violations & Corrective Action as a result of the June 23-24 inspection of AAL. PA 804-06. Defendant Sturgeon concluded that a fire sprinkler system had to be installed at AAL for two reasons: (1) the facility was licensed for more than sixteen residents; and (2) the facility provided care for more than two semi- or non-ambulatory residents. This report was faxed to RCS on June 30, 2003. PA 803.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -9-

On July 2, 2003, plaintiffs' counsel reported that CarePartners had obtained a commitment from its landlord to install a sprinkler system at AAL, but that it would "take some time to implement," probably six months. Dkt. # 158, Ex. A. Plaintiffs requested that the conditions imposed on AAL's license be lifted while they installed the sprinkler system. RCS, however, wanted to know how CarePartners intended to ensure the safety of its semi- and non-ambulatory residents during the six months before the sprinklers would be operable. No response was forthcoming. Dkt. # 158 at 3. RCS conducted a follow-up inspection of AAL on July 7th and 9th. The inspectors found that none of the residents had been given a notice of discharge (a thirty day notice was required), no fire watch staff had been hired, and the existing plan of evacuation was insufficient and had not been approved by the local fire department. PA 817-20.

On July 10, 2003, defendants McClintock and Lord met with plaintiffs and their attorneys to discuss what progress had been made to correct the deficiencies at the facility. Plaintiffs presented a plan for correction which stated that AAL had received approval from the landlord to install a fire sprinkler system, that a cost estimate and preliminary plans were being obtained, and that the completion date was "to be determined." PA 810. The next day, statewide regulators met to evaluate the corrective action plans submitted by AAL and the latest inspection report. Defendant Tyson, who had been monitoring the progress of AAL towards compliance with the license conditions, discussed AAL's status with defendant Lashway. Dkt. # 28 at 9-10. Lashway decided to issue a Notice of Summary Suspension, License Revocation, and Stop Placement Order Prohibiting Admissions to AAL on the ground that its failure to comply with fire safety regulations presented an imminent danger to its residents. Dkt. # 173 at 4-5; PA 823-25.

In response to the order, plaintiffs took their story to the media, filed an administrative appeal of the license suspension, and asked the Thurston County Superior Court for an emergency stay during the administrative appeal. The Superior Court granted a temporary stay and ordered the parties to present briefing and engage in mediation. During mediation, RCS

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -10-

offered to rescind the licensing suspension and allow some semi- and non-ambulatory residents to remain at the facility if plaintiffs agreed to install sprinklers within ninety days and to hire full-time firefighters to patrol the facility until the sprinkler system was operable.  PA 895-96. Though Kilkelly was willing to install sprinklers within six months, he would not agree to hire firefighters pending installation, arguing that the financial cost of such a measure would be fatal to his business.  The negotiations broke down.

On July 24, 2003, the Superior Court denied plaintiffs' motion for a stay.  Plaintiffs appealed the Superior Court's decision to the Washington State Court of Appeals.  They also contacted RCS to say that AAL would do whatever it took to stay open, including hiring full-time fire monitors.  RCS did not respond to plaintiffs' overtures, instead removing twenty-eight residents from AAL on July 28, 2003.  On August 3, 2003, the Court of Appeals denied plaintiffs' motion for a stay, finding that: (1) plaintiffs had failed to show a likelihood of prevailing on their administrative appeal; (2) there was a sufficient hazard to justify the emergency order; and (3) the need for boarding home code enforcement outweighed any harm to plaintiffs.  Plaintiffs temporarily prevailed on their administrative appeal in September 2005 when the administrative law judge found that there was no "emergency" that could justify summary suspension of AAL's license.  That decision was reversed by the Board of Appeals, however.  Plaintiffs' appeal of the final administrative decision before the Thurston County Superior Court was subsequently withdrawn.

### III. DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  All reasonable inferences supported by the evidence are to be drawn in favor of the nonmoving party.  See

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                     -11-

<u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002).  The production of "a scintilla of evidence in support of the non-moving party's position" is not sufficient, however. <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th Cir. 1995).  Summary judgment should be granted if the nonmoving party fails to come forth with evidence from which a reasonable jury could return a verdict in its favor.  <u>Triton Energy</u>, 68 F.3d at 1221.  Hyperbole, supposition, and conclusory accusations cannot take the place of evidence.  <u>British Airways Bd. v. Boeing Co.</u>, 585 F.2d 946, 655 (9th Cir. 1978).  Nor will the production of a stack of uncited documents in opposition to a motion for summary judgment satisfy plaintiffs' burden.  The Court need not, and will not, "scour the record in search of a genuine issue of triable fact." <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir. 1996).  <u>See</u> <u>also</u> <u>White v. McDonnell-Douglas Corp.</u>, 904 F.2d 456, 458 (8th Cir. 1990) (the court need not "speculate on which portion of the record the nonmoving party relies, nor is it obliged to wade through and search the entire record for some specific facts that might support the nonmoving party's claim").[4]

---

[4] Most of plaintiffs' conclusory allegations of conspiracy, ill-will, and animus have been disregarded because plaintiffs have not made the effort to locate and identify supporting evidence in the record.  For example, plaintiffs assert that Tyson referred to RCS' "history" with CarePartners in early February 2003 (Opposition at 16-17) and imply various procedural irregularities in the way AAL was treated by RCS (Opposition at 19, 21, 28).  Despite the fact that plaintiffs provided over 3100 pages of declarations and exhibits in response to defendants' motion for summary judgment, there is no evidence cited in support of these accusations or, where citations are provided, the referenced pages do not support plaintiffs' contentions.  At oral argument, plaintiffs' counsel highlighted a handful of documents, most of which had never been called to the Court's attention before.  One of the documents uses the phrase "we may have a history of this person."  If this is the evidentiary basis for plaintiffs' assertion against Tyson, it is unpersuasive.  The email was written by someone named Elaine Odom with no indication that Tyson responded to or agreed with her characterization.

In addition, many of plaintiffs' basic factual contentions are based solely on citations to the narrative of events provided by Joseph P. Kilkelly on October 10, 2006 (PA 527-76).  This reliance on secondary evidence has confounded the Court's efforts to determine whether a genuine issue of material fact exists:  at times, Kilkelly clearly lacks personal knowledge of the events he describes, and the Court has spent an inordinate amount of time hunting through the voluminous record in an attempt to find the evidentiary basis for Kilkelly's statements.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                -12-

### B.  42 U.S.C. § 1983

Section 1983 of the Civil Rights Act of 1964 provides a federal cause of action against persons acting under the color of state law who deprive another of their federal rights.  <u>See</u> <u>Gibson v. United States</u>, 781 F.2d 1334, 1338 (9th Cir. 1986).  The statute does not create substantive rights, but merely provides "a method for vindicating federal rights elsewhere conferred."  <u>Graham v. Conner</u>, 490 U.S. 386, 393 (1989).  Washington state, RCS, and SFM are not proper defendants under § 1983 because neither a state nor a state agency is a "person" for purposes of the statute.  <u>See</u> <u>Howlett v. Rose</u>, 496 U.S. 356, 365 (1990); <u>Doe v. Lawrence</u> <u>Livermore Nat'l Lab.</u>, 131 F.3d 836, 839 (9th Cir. 1997).  State officials may, however, be sued under § 1983 in their personal capacity, as opposed to their official capacity.

"Personal-capacity suits seek to impose personal liability upon a government official for actions [the official] takes under color of state law."  <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985).  Liability in a personal-capacity suit can be demonstrated by showing that the official caused the alleged constitutional injury.  <u>Id.</u> at 166.

> A person deprives another of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains.  The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation.

<u>Leer v. Murphy</u>, 844 F.2d 628, 633 (9th Cir. 1988) (citations omitted).  "Sweeping conclusory allegations will not suffice to prevent summary judgment. The [plaintiffs] must set forth specific facts as to each individual defendant's causal role in the alleged constitutional deprivation."  <u>Id.</u> at 634 (citation omitted).

### C.  First Amendment Retaliation

Plaintiffs' First Amendment claim is based on the theory that defendants were so angered

by Kilkelly's speech and petition activities that they planned and executed the February and June inspections and ultimately suspended AAL's license.  Plaintiffs allege five specific acts that are protected under the First Amendment:  (1) CarePartners' administrative appeal of the $300 fine levied against Meridian Hills Assisted Living in mid-2002 (the administrative process ended in October 2003); (2) CarePartners' legislative lobbying efforts to acquire a "grandfathered" license for the boarding home facility in Lakewood, Washington in January and February 2003; (3) Kilkelly's advocacy regarding the interpretation of sprinkler and ambulation requirements as they applied to AAL and WAL; (4) Kilkelly's statement to the press after AAL's license was revoked on July 11, 2003; and (5) CarePartners' pursuit of both administrative and judicial review of the summary revocation of AAL's license.  The Ninth Circuit found that these activities "fall within the First Amendment's protection of the rights to free speech and to petition for a redress of grievances."  CarePartners LLC v. Lashway, 545 F.3d 867, 877 (9th Cir. 2008).

A "plaintiff alleging retaliation for the exercise of constitutionally protected rights must show that the protected conduct was a 'substantial' or 'motivating' factor in the defendant's decision."  Soranno's Gasco, Inc. v. Morgan,  874 F.2d 1310, 1314 (9th Cir. 1989) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  If the plaintiff makes this *prima facie* showing, the "burden shifts to the defendant to establish that it would have reached the same decision even in the absence of the protected conduct." Id.

1.  Causation

Although plaintiffs identify five protected activities, they make no effort to link those activities to any particular action taken by defendants, retaliatory or otherwise.  Any argument that defendants inspected the CarePartners facilities and/or suspended AAL's license in retaliation for Kilkelly's statement to the press or his attempts to stay the suspension order must fail.  These protected activities occurred after the inspections and license suspension and could not have been a substantial or motivating cause of the constitutional injuries alleged.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -14-

2. Knowledge of the Protected Activities

Implicit in the requirement that plaintiffs make a *prima facie* showing that their protected activities were "a substantial or motivating factor" behind the enforcement actions is the need to show that defendants knew about Kilkelly's protected activities. Findings regarding knowledge and causation must be made on an individualized basis and cannot be imputed: plaintiffs must present evidence regarding each defendant. Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001); Raad v. Fairbanks North Star Borough School Dist., 323 F.3d 1185, 1197-98 (9th Cir. 2003).

Despite recognizing that an individualized analysis of the knowledge and conduct of each defendant is required,[5] plaintiffs make almost no effort to particularize the allegations against the individual defendants. In fact, throughout much of the response memorandum it is almost impossible to differentiate defendants from non-defendants or to identify the theories under which plaintiffs hope to hold most of these individuals liable. In one summary paragraph on page 39 of the response, plaintiffs assert that defendants McClintock, Lashway, and Tyson clearly "had a hand in what occurred here at various stages of time," that defendants Webb, Lord, Borgatti, and Sturgeon "cooperated in the process and scheming," that defendant Woodside's "actions became increasingly combative and retaliatory as Mr. Kilkelly's speech progressed," and that defendant Corso "was aware of the actions of her subordinates." Dkt. # 185-3 at 39.

Rather than explain how each defendant learned of Kilkelly's protected activities and

---

[5] In plaintiffs' motion for additional pages in which to respond to defendants' motion for summary judgment, plaintiffs argued:

[L]iterally within one paragraph of Defendants' Motion, Plaintiffs are required to place before the Court and brief, [sic] the factual predicates for the liability of ten individual defendants, which will require substantially more pages than the 24 pages normally set forth within the rules.

Dkt. # 161 at 2.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -15-

caused constitutional injury, plaintiffs attempt to circumvent their burden of proof by relying on a conspiracy theory of liability through which each defendant is deemed to know what the others knew and to bear responsibility for their conduct.  This effort must fail.  Liability under § 1983 arises when a person deprives another of a constitutional right by performing an affirmative act, participating in another's affirmative act, or omitting to perform an act which he is legally required to do.  The acts and omissions of each defendant are determinative:  unsupported allegations of a conspiracy cannot substitute for culpable behavior.  The imputation of knowledge of protected activity in a retaliation case is specifically barred under Ninth Circuit authority because it could convert wholly innocent regulatory activity into a constitutional violation without any factual basis:  it would "be just as inappropriate as imputing knowledge of the race of an applicant in a disparate treatment case when there is no evidence that the employer knew the applicant's race."  Raad, 323 F.3d at 1197-98.

Although much of plaintiffs' argument assumes that the February inspections and other regulatory actions were prompted by Kilkelly's attempts to obtain special consideration of his proposed Lakewood application, it appears that the only defendants who knew of those efforts were defendants Lashway and Tyson.  PA 702-06.[6]  There is no evidence that Lashway or Tyson were involved in the February inspections, and there is no indication that Lashway or Tyson shared their knowledge with other defendants.  Plaintiffs have not shown that the Lakewood dispute was generally known throughout RCS, much less SFM, and cannot simply impute Lashway and Tyson's knowledge to any of the other defendants.  The cases plaintiffs cite as

---

[6]  There is evidence that defendants Stockwell and Tyson learned of the Meridian Hills dispute when the Board of Appeal issued its final decision on October 20, 2003.  PA 694.  Plaintiffs do not cite this evidence, however, and do not argue that the information caused the retaliatory acts of which they complain.  Nor could they, given that the allegedly retaliatory inspections and suspension occurred before Stockwell and Tyson received a copy of the Review Judge's order.

To the extent plaintiffs base their retaliation claim on Kilkelly's advocacy regarding the correct interpretation of the LC Code, those allegations are discussed below.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -16-

support for the imputation of one defendant's knowledge to another are distinguishable.  In

Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1301-1302 (9th Cir. 1999), and

Gilbrook v. City of Westminster, 177 F.3d 839, 854 (9th Cir. 1999), knowledge of the protected

activities was assumed (not imputed) because the protected activities in each case were highly

publicized and well-known to all defendants.  There is no evidence to support such an assumption

here.

            3.  Retaliatory Intent

        The Court will assume, for purposes of this analysis, that defendants Lashway and Tyson

knew of Kilkelly's Lakewood-related activities prior to Van Beek's February 3, 2003, inspection

of WAL.  The Court will also assume that all of the defendants were aware of Kilkelly's dispute

regarding the interpretation and application of the sprinkler and ambulation requirements of the

LC Code after the February 3rd inspection and before the July 2003 license suspension.[7]  The

question, then, is whether plaintiffs have raised an inference that the February and June

inspections of AAL and WAL and/or the suspension of AAL's license in July were retaliatory.

            a.  February 2003 Inspections

        There is no evidence that Lashway or Tyson, the only defendants who had knowledge of

Kilkelly's efforts to get the Lakewood facility licensed as an existing home, communicated with

Van Beek or otherwise prompted SFM to inspect WAL on February 3, 2003.  Plaintiffs

acknowledge that this inspection was an annual fire safety survey for the Fire Marshal's Office.

PA 553.  Likewise the February 27, 2003, inspection of AAL by RCS was part of the annual

review process (PA 557) and there is no evidence that defendant Webb had been told of

---

[7]  This assumption is not necessarily supported by the record.  For example, it appears that
defendant Lashway first became aware of the sprinkler dispute in June 2003 when conditions were
placed on AAL's and WAL's licenses.  Dkt. # 173 at 2.  There is no evidence that defendant Corso ever
learned of Kilkelly's advocacy or that defendant McClintock was involved in or aware of the dispute
before July 2003.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -17-

Kilkelly's protected activity or was directed to conduct the inspection by Lashway or Tyson.[8]

Of course, direct evidence of retaliatory motive is not required in First Amendment cases. In Keyser v. Sacramento City Unified School Dist., 265 F.3d 741 (9th Cir. 2001), the Ninth Circuit summarized the situations in which circumstantial evidence has sufficed to raise a genuine issue of material fact regarding motive. Plaintiff may establish a *prima facie* case of retaliation by showing that defendant had knowledge of the protected activity and that at least one of the following three circumstances exist:

> First, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that the "proximity in time between the protected action and the allegedly retaliatory employment decision" was one in which a "jury logically could infer [that the plaintiff] was terminated in retaliation for his speech." Schwartzman v. Valenzuela, 846 F.2d 1209, 1212 (9th Cir.1988) (internal quotation marks omitted). Second, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that his employer expressed opposition to his speech, either to him or to others. Schwartzman v. Valenzuela, 846 F.2d at 1212 (affirming the denial of summary judgment for employer because, in addition to producing evidence that his employer knew of his speech, the plaintiff produced a memorandum from his employer "warning him that he was not authorized to speak out"); Allen v. Scribner, 812 F.2d 426, 434-35 (9th Cir. 1987) (reversing grant of summary judgment for employer because the plaintiff produced evidence that his employer knew of his speech as well as evidence that his employer told co-workers that the plaintiff should be removed because he expressed his opinions). Third, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that his employer's proffered explanations for the adverse employment action were false and pretextual. Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1315-16 (9th Cir.1989) (reversing summary judgment because the evidence suggested that the defendant had a "desire to maximize the harm inflicted upon Soranno, rather than a concern with receiving the requested information").

---

[8] It was only after Webb questioned AAL regarding the ambulatory status of its residents that Kilkelly disputed Van Beek's interpretation of the LC Code. PA 554. His advocacy activities related to the interpretation of the sprinkler and ambulation regulations could not, therefore, have motivated the initial inspection of either WAL or AAL.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                   -18-

 265 F.3d at 751-752.  Plaintiffs do not contend that defendants expressed retaliatory animus related to the Lakewood dispute or otherwise opposed Kilkelly's right to seek special consideration of his license application.  Nor have plaintiffs shown that the February inspections were abnormal or pretextual.  The only potential argument is that the February inspections were so close in time to plaintiffs' protected speech that a genuine issue of fact regarding retaliatory intent has been raised.  Although plaintiffs discuss this theory in only the most general terms, the Court has considered the temporal relationship between events and finds that, based on the facts presented here, the jury could not logically conclude that the Lakewood dispute was a substantial or motivating factor behind the February inspections.

First, as previously discussed, plaintiffs have not shown that anyone involved in the February inspections had knowledge of plaintiffs' Lakewood application.  Nor is there any indication that defendants Lashway and/or Tyson directed their subordinates to conduct the investigations.  This total lack of connection between the protected activity and the allegedly retaliatory conduct is fatal to plaintiffs' claim that the February inspections were retaliatory.

Second, plaintiffs would ask the jury to assume, based on nothing more than timing, that Kilkelly's efforts to license the Lakewood facility so infuriated Lashway and/or Tyson that they set out to revoke CarePartners' license at another facility.  The only contemporaneous evidence regarding defendants' state of mind suggests otherwise, however.  The correspondence between plaintiffs and defendants regarding the Lakewood facility is forthright and constructive:  there is no indication that defendants were upset by Kilkelly's request for consideration as an existing facility or that they thought the request was unusual or noteworthy.  PA 700-06.  Defendant Lashway states that requests for grandfathering and the involvement of state legislators in disputes with regulated facilities were common events that did not engender negative feelings.  In fact, by the time Lashway became aware of the problems at AAL in June 2003, she "had no recollection of any prior activities of the operators of AAL, including CarePartners, LLC,

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -19-

CarePartners Management, LLC, or Joseph Kilkelly." Dkt. # 173 at 6. "RCS had approximately 3,000 licensed facilities at that time and no ability to know the names of all persons[] involved in the corporate ownership, licensure, or operations of each facility, or future facility. Correspondence of this type is not something I would typically remember or associate with individuals involved." Dkt. # 173 at 7. To the extent the temporal relationship between the Lakewood dispute and the February inspections implies a causal connection, it is contradicted by other, more salient, evidence in the record.

Third, the timing of the events is not particularly helpful to plaintiffs. As Kilkelly acknowledges, RCS and SFM were in the process of developing a statewide response to the handful of licensed boarding homes that had not taken advantage of the voluntary retrofitting program to install sprinklers in their facilities. PA 556 ("Unbeknownst to us, this was just the beginning of the efforts by [the] Department of Social and Health Services and Washington State Fire Marshal's Office to impose fire sprinkler requirements on all boarding homes within the State of Washington."). This statewide effort had begun in December 2001, long before plaintiffs attempted to license the Lakewood facility, and was not targeted at CarePartners or its facilities. In this context, the fact that RCS and SFM began inquiring about the ambulatory status of AAL's residents in February 2003 is neither remarkable nor suspicious.

Finally, plaintiffs' theory, at least regarding WAL, is doomed by the details. Plaintiffs offer no evidence that either Lashway or Tyson knew of Kilkelly's Lakewood-related speech and petition activities when Van Beek inspected WAL on February 3rd. Absent evidence regarding the dates of the relevant events, plaintiffs cannot establish causation.

b. June 2003 Inspections

Plaintiffs argue that RCS and SFM conducted joint inspections of plaintiffs' facilities on June 23rd and 24th in retaliation for Kilkelly's efforts to influence their interpretation of the LC Code. Such an inference would be improper because it is based on nothing more than rank

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                      -20-

speculation.  As discussed above, plaintiffs have failed to raise an inference that Van Beek or defendant Webb acted with retaliatory animus when they inspected the facilities in February 2003.  In light of the documented and continuing statewide effort to bring all facilities into compliance with the LC Code, the fact that RCS and SFM took action in response to the reports generated during the February inspections does not raise an inference of retaliatory intent.

Nor do the intra- and inter-agency communications support plaintiffs' allegation of retaliation.  The record shows that defendants, at various times and in various venues, conferred in an attempt to reach a consensus regarding how to interpret the sprinkler and ambulation requirements.  Although plaintiffs characterize these communications as "plotting sessions," there is nothing about them that suggests a nefarious purpose.  It is hard to imagine how one, much less two, agencies could reach an agreement on how to enforce the regulations consistently across the state in the absence of discussion and analysis.  Kilkelly was allowed to offer his interpretation of the regulations and was never admonished for speaking out.  There is no indication that Kilkelly's input was unwelcome throughout this process, even if his preferred interpretation was not ultimately adopted.  Nor is there any reason to believe that Kilkelly's identity or his interest in AAL and WAL played a part in the regulatory response.[9]

In the absence of evidence of ill-will or animus, plaintiffs rely on conclusory accusations. Plaintiffs assert, for example, that defendant Stockwell had as her "goal" the revocation of AAL's license (Opposition at 22) and that defendants Tyson, Lord, Stockwell, and Sturgeon had decided to revoke AAL's license before they had evidence of any violations (Opposition at 18).  These

---

[9]  At oral argument, plaintiffs' counsel argued that the fact that Kilkelly's name appears in the notes of the June 5, 2003, meeting is evidence that the regulators were targeting him in retaliation for his First Amendment activities rather than simply enforcing the regulations at WAL and AAL.  Such an inference would be unreasonable.  Kilkelly's interest in the ambulatory and sprinkler issues and his relationship to the facilities under discussion explain the inclusion of his name.  There is no indication of personal or retaliatory animus in the notes that could convert a person's name into evidence of retaliatory intent.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                                -21-

statements are not supported by the record.  Since February 2003, RCS and SFM reports repeatedly note the high number of semi- and non-ambulatory residents in plaintiffs' facilities and raise concerns regarding fire safety.  The notes of the June 5, 2003, conference call (in which five defendants and seven non-defendants participated) merely reflect that the data obtained in February, March, and April had to be confirmed through additional inspections and that RCS would consider action against AAL's and WAL's licenses if the suspected violations were confirmed.  PA 1599, 1981-83.  As a regulatory agency tasked with enforcing the state's boarding home regulations, RCS was well within its discretion when it developed a plan of action to address the situation at WAL and AAL.  Bald assertions of "plots," "raids," and conspiracies cannot support a First Amendment retaliation claim.  Plaintiffs have had months of discovery and a full opportunity to uncover evidence of animus:  they cannot rely on unsupported accusations at this point in the litigation.

### c.  July 2003 Suspension

Plaintiffs assert that the suspension of AAL's license on July 11, 2003, was retaliatory. For the reasons discussed above, to the extent this allegation is based on the fact that Kilkelly sought to grandfather the Lakewood facility and/or argued that sprinklers were not required at AAL, the temporal relationship alone does not raise an inference of retaliatory motive in the circumstances presented here.  Plaintiffs also argue that RCS' gross overreaction to the situation at AAL, statements attributed to RCS officials by attorney Robin Dale, and the more lenient treatment afforded WAL and other boarding homes support its claim of retaliatory suspension.

### i.  Lack of an Emergency

In one sentence, with no supporting citations, plaintiffs argue that the situation at AAL was not urgent enough to justify "the Draconian actions taken against Alderwood Assisted Living" and suggest that the absence of a legitimate regulatory interest shows that Kilkelly's protected speech was the real motivating factor.  Opposition at 28.  Plaintiffs do not identify the

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -22-

standard by which RCS' decision is to be measured.  Nor do they attempt to explain why a facility that houses forty-six semi- or non-ambulatory residents in an unsprinklered, two-story building with a defend-in-place evacuation plan and only two night-time employees does not pose an unacceptable safety risk to its residents in case of fire.  Although this matter could be debated (and the administrative law judge sided with plaintiffs), defendant Lashway could reasonably conclude, as did the Washington State Court of Appeals, the Board of Appeal, and the Thurston County Superior Court, that there was a sufficient hazard to justify an emergency order.

### ii.  Hearsay Statements of Robin Dale

Attorney Robin Dale was hired by plaintiffs on July 7, 2003, to negotiate a settlement of the conditions that had been placed on AAL's and WAL's licenses.  PA 148.  According to Dale's declaration, RCS officials declined his requests for high-level meetings because Kilkelly was "known" to the department and defendant Lashway was "losing patience with Joe."  PA 149. To the extent that these statements are presented to show what one or more of the named defendants were thinking in July 2003, they are unsworn statements offered "to prove the truth of the matter asserted" and are therefore inadmissible. Fed. R. Evid. 802(c).  See, e.g., Block v. City of Los Angeles, 253 F.3d 410, 419 (9th Cir. 2001).  Dale has no personal knowledge of the statements recounted in his declaration and cannot testify regarding Lashway's state of mind. These statements have not been considered by the Court.[10]

### iii.  Disparate Treatment

Plaintiffs argue that AAL was treated differently than other similarly-situated boarding homes in two respects:  (1) Kilkelly and his attorneys were unable to schedule a high-level meeting after conditions were placed on AAL's and WAL's licenses on June 27, 2003; and

---

[10]  For purposes of this motion, the Court has considered all other evidence cited by plaintiffs in their memorandum or highlighted at oral argument.  Defendants' other evidentiary objections are overruled.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -23-

(2) WAL, Queen Anne Manor, Fleming House, and German Retirement Home were all "provided substantially better treatment than Alderwood in the areas of fire watch, ambulation determinations (which others were allowed to contest), the absence of need to discharge any residents, and the timing and ability to put in a fire sprinkler system prior to being subject to closure . . . ." Opposition at 29.

AAL was notified of the conditions on its license at the end of the day on June 27, 2003, a Friday. Between June 27th and July 11th (a total of nine business days), there were at least three substantive conversations between plaintiffs and various defendants, as well as another round of inspections at AAL.[11] Plaintiffs were unhappy with the results of these conversations and sought additional meetings with progressively "higher-level" employees. Although attorney Dale suggests that RCS was "unusually resistant in any efforts to meet with Mr. Kilkelly" (PA 149), the objective evidence does not support this conclusory statement. Both sides were aware of each others' positions: plaintiffs wanted additional meetings in the hopes of convincing RCS to lift some or all of the license conditions and defendants were intent on enforcing those very conditions. Defendant Lashway, who was handling licensure compliance issues while defendant

---

[11] The record shows that AAL immediately initiated a conference call with the RCS Field Managers Tim Vox and defendant Lord. PA 563. Failing to resolve the controversy, plaintiffs retained legal counsel over the weekend. PA 564-65. During the next week, Kilkelly attempted to contact SFM to seek additional information regarding the sprinkler requirement, but was apparently unable to speak with anyone. PA 565. Attorney Tom Grimm contacted Catherine Hoover on July 2nd by phone and email. Hoover responded via email the next day, reiterating the shortcomings of plaintiffs' counterproposal, declining to arrange a meeting with defendant Stockwell in order to discuss lifting the conditions for six months while plaintiffs installed sprinklers, noting that RCS would be conducting follow-up inspections, and inviting further communication through Lord and Vox. Dkt. # 158-2. RCS again inspected AAL on July 7th and 9th. Robin Dale, who became involved in the case on July 7th, arranged a meeting between plaintiffs and defendants McClintock and Lord on July 10th. Plaintiffs provided a proposed plan for correction. PA 810. The next day, defendant Webb and the other RCS staff generated a Statement of Deficiencies related to the latest inspection of AAL. PA 817-20. Defendant Lashway was informed of these events by her staff and decided that an emergency safety risk existed, that plaintiffs were not willing to take the necessary steps to ensure resident safety, and that suspension of AAL's license was appropriate.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -24-

Stockwell was on leave, was informed that AAL was willing to install sprinklers in six months but was not willing to comply with the other conditions that were designed to ensure resident safety in the interim. Absent some indication that plaintiffs were willing to address the safety issues that prompted the imposition of conditions, Lashway declined a personal meeting with plaintiffs. Dkt. # 173 at 3-4. No inference of retaliation arises in the circumstances presented here.

In their memorandum, plaintiffs twice accuse defendant Woodside of orchestrating an information blackout that impinged plaintiffs' ability to resolve the fire safety concerns at WAL and AAL. Opposition at 20, 21-22. Although no evidence is cited in support of these assertions, at oral argument, counsel presented a July 16, 2003, email in which Woodside alerts his staff that CarePartners had obtained legal counsel in its dispute regarding WAL and AAL and that all contact with those facilities should go through Woodside and/or SFM's legal counsel. There is no indication that this communication was improper or unusual given the circumstances of this case.

Plaintiffs' argument regarding the favorable treatment afforded other facilities is conclusory and, to some extent, illogical. If, as plaintiffs contend, defendants were incensed by Kilkelly's First Amendment activities and used the regulatory process to retaliate against him, why did they suspend only AAL's license and not WAL's? The logical inference is that defendants were acting based on perceived differences at the facilities, not as the result of animus toward Kilkelly and/or his activities. Indeed, WAL resolved the emergency safety risk that prompted the imposition of conditions by discharging ten of its semi- and non-ambulatory residents. AAL, on the other hand, made virtually no effort to reduce its semi- and non-ambulatory population or to ensure their safety while a sprinkler system was investigated and installed.

To show disparate treatment, plaintiffs must show that other similarly situated facilities

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -25-

which did not engage in protected activity were treated differently.  For purposes of this analysis, facilities are similarly situated if the regulatory concerns are of "comparable seriousness." Vasquez v. County of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2004).  Plaintiffs mention three non-CarePartners comparators but provide only the barest factual assertions coupled with citations to voluminous records.  See, e.g., Opposition at 29 (citation to almost 300 pages in support of assertion that other facilities "were treated substantially different [sic]").  In the absence of meaningful assistance from plaintiffs, the Court has paged through the deposition transcripts and documents cited and finds that a reasonable factfinder could not infer disparate treatment.  Although AAL, Queen Anne Manor, Fleming House, and German Retirement Home were initially treated substantially the same, the compliance efforts of each facility varied, justifying different regulatory actions.  Queen Anne Manor, for example, had forty-nine semi- or non-ambulatory residents (48%) in a multi-story building and received a Statement of Deficiencies identifying the same problems and concerns as at AAL.  Conditions were placed on the Manor's license, including relocating or discharging all mobility-challenged residents on the upper floors and hiring additional night-time staff, including two fire watchers.  There is no indication that Queen Anne Manor refused to take these interim protective measures while they installed sprinklers.  In response to the Statement of Deficiencies issued to and the conditions imposed on German Retirement Home, the facility immediately sought bids from sprinkler companies.  To ensure the safety of their residents in the interim, German Retirement Home hired fire watchers, developed new fire procedures that were approved by SFM, built an additional stairway off a back deck, and installed railings to allow residents to ambulate a safe distance from the building.  Fleming Home is a single story facility that was given two options:  to discharge all but two semi- or non-ambulatory residents or to install a sprinkler system and hire a fire watch in the interim.  Fleming Home chose the latter option, and a follow-up inspection showed that night-time staff had been increased and included a fire watch.  The final regulatory response to these

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -26-

facilities was different (i.e., did not result in suspension) because they took the steps necessary to reduce the safety risks identified by defendants.

Plaintiff has provided no admissible evidence, circumstantial or otherwise, from which a factfinder might logically infer that plaintiffs' protected activities played any part in defendants' actions.[12]

## IV.  CONCLUSION

Plaintiffs have had a full and fair opportunity to find evidence that defendants' enforcement actions were retaliatory.  Despite the presentation of over 3,100 pages of documents, none of the correspondence, emails, notes, or deposition transcripts cited reveals animus toward plaintiffs or their protected activities.  Plaintiffs' case is based on nothing more than the temporal relationship between Kilkelly's speech and the February 2003 inspections of AAL and WAL.  In the circumstances presented here, however, this relationship does not give rise to an inference of retaliation.  RCS and SFM had already initiated a statewide effort to enforce the LC Code when Kilkelly exercised his First Amendment rights to petition the legislature regarding the Lakewood application.  When potential violations of the fire safety regulations were found at AAL and WAL, RCS and SFM conferred regarding the appropriate interpretation of the regulations, conducted additional investigations, and imposed conditions designed to ensure the safety of the residents in case of fire.  When plaintiffs failed to comply with the conditions imposed on AAL's license, it was suspended.  WAL, which did comply, continued to operate.  Plaintiffs essentially argue that their speech and lobbying activities should act as a talisman against enforcement actions:  that RCS and SFM should have ceased all efforts to protect AAL's residents when Kilkelly sought special consideration of the Lakewood application and/or disagreed with Van

---

[12]  Because plaintiffs have not met their initial burden of proof, the Court need not consider whether defendant Lashway is entitled to absolute prosecutorial immunity, whether Laura Kilkelly's claim of retaliation is colorable, or whether defendants would have taken the same actions in the absence of Kilkelly's protected activities.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -27-

Beek's interpretation of the LC Code.  Such a rule would be absurd and unworkable.

For all of the foregoing reasons, the Court finds that plaintiffs have not presented a *prima facie* case that Kilkelly's protected conduct was a substantial or motivating factor behind defendants' actions.  Defendants' motion for summary judgment on plaintiffs' § 1983 claim is GRANTED.  Because it appears that plaintiffs will be unable to show that defendants interfered with their valid contractual relationship for an improper purpose or using improper means, plaintiffs are hereby ORDERED TO SHOW CAUSE why judgment should not be entered on their tortious interference claim.  The Clerk of Court is directed to note this Order to Show Cause on the Court's calendar for Friday, April 16, 2010.  Plaintiffs shall file their response, if any, within fourteen days of the date of this Order.  Defendants may file a reply on or before the note date.

Dated this 22nd day of March, 2010.

Robert S. Lasnik
United States District Judge

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND ORDER TO SHOW CAUSE                    -28-